# United States District Court
# Eastern District of Wisconsin

## Johnsonville Sausage v. Klement Sausage
16-CV-938



Video Deposition of

**Kelly Jackson - Rule 30(b)(6)**

Recorded 05/11/2018 in Milwaukee, WI

9:04 am - 4:17 pm, 353 mins. elapsed

**Magne-Script**

(414) 352-5450



*21935 Condensed transcript with index*

## Page 85

1 reading?
2  Q  No, that's fine.
3  A  Keep reading?
4  Q  Then go to paragraph 6.
5  A  Okay. Claims 1 to 7 are finally rejected under 35
6     U.S.C. 103(a) as being unpatentable over Reskow in
7     view of Mellow, et al."  Would you like me to
8     continue?
9  Q  No.
10 A  Okay.
11 Q  From Johnsonville's standpoint, are their claims
12    rejected based on these two examiner statements?
13 A  I see several statements from the examiner here, so I
14    -- I'm not sure that I can answer that question by
15    saying it's based on those two.  I see several
16    statements in the document.  And again, I'm not --
17 Q  Is it based on --
18 A  -- I'm not a patent attorney.
19 Q  Yes.
20        MS. WILBERT:  I've got a notice that the
21    food has arrived, and I think we've been going
22    for about an hour and a half.
23 BY MR. FEMAL:
24 Q  Yeah, is it --
25        MS. WILBERT:  Could we take a break soon?

## Page 86

1  BY MR. FEMAL:
2  Q  Is it based on the prior art, though, of Mello and
3     Reskow?
4  A  I see Mello and Reskow cited as some of the reasons
5     from the examiner here.
6  Q  Yeah.  Is there any other prior art references in
7     there that you can see?
8        MS. WILBERT:  Again, I'd like to reiterate,
9     time for a lunch break.
10       MR. FEMAL:  Yeah.
11 BY MR. FEMAL:
12 Q  Answer the question.  Do you see any other references?
13 A  I don't see any in this document.
14 Q  Okay.
15       THE WITNESS:  We good for a break?
16       MS. SCHLICHT:  Well, there's only a couple
17    more questions in this one section --
18       MR. FEMAL:  Yeah, and we're done --
19       MS. SCHLICHT:  -- and then we can take a --
20       MR. FEMAL:  -- yeah, with the section.
21       MS. WILBERT:  We've been going for 90
22    minutes.  You know, it's not like we just took a
23    break 20 minutes ago.  I'd really like to break
24    for lunch and we can get right back at it.
25       MR. FEMAL:  Well, we are done with -- about

## Page 87

1     two questions here, so why don't I finish up and
2     it'd be less than five minutes.
3        MS. WILBERT:  Okay.
4  BY MR. FEMAL:
5  Q  And then give you Exhibit 4 in Kohtala's dep.  And you
6     don't have to pile --
7  A  And this is --
8  Q  -- all the way --
9  A  This is five minutes?
10 Q  Yeah.  No, you don't have to pile -- it's a very short
11    question on this one.
12 A  What is this?
13 Q  It looks like the complete file history of that
14    utility patent application.
15 A  Yeah, I think -- I think we should take a break.
16 Q  Yeah, but I'm going to ask a real simple question.
17 A  Okay.
18 Q  Why was the application abandoned by Johnsonville?
19 A  "Why was the application abandoned by Johnsonville?"
20    Which application are you referring to?
21 Q  Utility.
22 A  Utility application.  If I can confer with my notes
23    again.  So I don't have a specific reason on why.  I
24    just know that as of June 2011, after the final office
25    action and the examiner interview, that Kevin Ladwig,

## Page 88

1     who I -- may have been his -- it's possible he was the
2     supervisor at the time, told him to abandon the
3     utility application.  I don't have anything as to why
4     the decision was made to do that.
5  Q  Was Johnsonville consulted about it before it was
6     abandoned?
7  A  I don't know.  I don't know what the specific
8     conversations may have been.
9  Q  So you don't know who made the decision.  Did
10    Johnsonville make the decision, consulting with
11    Quarles & Brady, or --
12 A  According to my notes, Kevin Ladwig told David
13    Nicholson to abandon the utility application.  I don't
14    have any information on the discussions around that or
15    the motive.
16 Q  Okay.  And the only page of relevance here is page 2
17    in the file history, which --
18 A  Page 2?
19 Q  -- is probably Notice of Abandonment?
20 A  Okay.
21 Q  And as you sit here today, Johnsonville doesn't know
22    all the reasons why they abandoned the application?
23 A  I'm sorry, one more --
24 Q  Johnsonville doesn't know all the reasons why they
25    abandoned the application.

## Page 89

1  A   Johnsonville is not aware of any specific reasons why
2      it was abandoned.
3  Q   Okay. Thank you.
4  A   Okay?
5  Q   Yeah.
6  A   Okay. You're right, that was quick.
7  Q   Didn't I tell you it was short?
8  A   That was quick.
9          THE REPORTER: All right. Off the record.
10             (Off the record)
11         THE REPORTER: We've taken a break for
12     lunch. We're back on the record.
13     BY MR. FEMAL:
14 Q   On the prosecution of the U.S. Patent 29353610, who
15     was primarily responsible from Johnsonville? This
16     application. That's the utility application.
17 A   Sorry. One more --
18 Q   Well, actually, I'm sorry.
19 A   What was the number? I'm not --
20 Q   Yeah, I'm sorry. It's the design patent application,
21     293535610.
22 A   Okay. David Nicholson was the primary member of
23     Johnsonville, employee of Johnsonville, who was
24     responsible for the design application.
25 Q   And who was primarily responsive at Quarles & Brady

## Page 90

1      for coordinating with David?
2  A   The attorneys with whom David Nicholson communicated
3      were Dan Radler and Luke Kohtala.
4  Q   And who was the decision-maker over Mr. Nicholson on
5      the patent matters?
6  A   I don't know that there was a decision-maker over him.
7      I'm not clear on that point. I know that he kept
8      several other employees informed. I don't know that
9      there's one specific individual who would have had
10     decision-making authority over him.
11 Q   Did he report to anyone at Johnsonville?
12 A   I'm certain. I don't know for sure who that is. I
13     know that he talked to several individuals: Kevin
14     Ladwig, Michael Suprick, Jim Mueller, Steve Laack,
15     Kara Lichtenberg, all tied to the project. I don't
16     know specifically who he reported to.
17 Q   And are you familiar with the file history for the
18     application?
19 A   I believe so, yes.
20 Q   And what do you know about the file history of the
21     design patent application?
22         MS. WILBERT: At this point, I'll instruct
23     the witness not to reveal legal strategy related
24     to this case for the design patent. So
25     communications that Johnsonville has had with

## Page 91

1      Quarles & Brady that inform Johnsonville's
2      knowledge are privileged.
3  A   Okay.
4          MS. WILBERT: But if you want to --
5  A   I'm happy to share --
6          MS. WILBERT: -- provide facts that
7      Johnsonville --
8          THE WITNESS: Yeah.
9          MS. WILBERT: -- knows that aren't
10     privilege, you can do that --
11         THE WITNESS: Yeah.
12         MS. WILBERT: -- in response to that
13     question.
14 A   Yeah. I'm happy to share a characterization of the
15     history of the design. Here's what we are aware of.
16     So as of March 10th, 2009, Quarles & Brady filed a
17     provisional application on behalf of Johnsonville.
18     Then on November 11, 2009, Johnsonville instructed
19     Quarles & Brady to file utility and design
20     applications related to curved sausage trays. On or
21     around January 11, 2010, Dean Benson agreed to assign
22     his rights and inventions disclosed in the design and
23     utility applications to Johnsonville. Then on January
24     12th, 2010, Johnsonville received copies of the file
25     design and utility sausage tray applications from

## Page 92

1      Quarles & Brady. On March 2, 2010, Quarles & Brady
2      filed design and utility sausage tray applications
3      with the European Patent Office. On March 31st, 2010,
4      Johnsonville received the recorded assignments from
5      Quarles & Brady. On August 12th, 2010, Johnsonville
6      received the European search report from Quarles &
7      Brady. On August 17th, 2010, Quarles & Brady filed an
8      IDS, which disclosed the references from the search
9      report from the European examiner. And then November
10     2nd, 2010, Johnsonville received the notice of
11     allowance of its design application from Quarles &
12     Brady. Finally, on March 8th, 2011, Johnsonville
13     received from Quarles & Brady the issue notification
14     of the design patent. And I would say that would
15     characterize what we do know as a company about the
16     history there. The content of specific
17     communications, beyond what I just shared, would be
18     considered privileged and Johnsonville would not want
19     to waive that privilege.
20 Q   Okay. And in regards to the design patent
21     application, are you familiar with the Mello, et al.
22     patent 5820904?
23 A   I'm familiar with that patent.
24 Q   And what do you know about the Mello patent, which was
25     Exhibit 9 at Kohtala's? Would you just take a quick

### Page 93

1  look?
2      MS. WILBERT: Again, I'll object to
3   privilege, and caution the witness that if what
4   Johnsonville knows about that is because of this
5   lawsuit and advice given with Quarles & Brady,
6   that would be privileged. If there are facts
7   related to that document that are independent of
8   Johnsonville's communications with Quarles about
9   this case, you can provide those facts.
10     THE WITNESS: Okay.
11  A  I will say that we are familiar with the patent.
12     We've seen that.
13  BY MR. FEMAL:
14  Q  Okay. And the drawings, are you familiar with the
15     drawings of the patent?
16  A  So again, we won't proceed any further on that note.
17     I would refer back to what I shared previously
18     regarding what is known by the company specifically
19     pertaining to that patent or other aspects of the
20     application process.
21  Q  Do you know why it was cited by the examiner?
22     MS. WILBERT: Objection. Foundation.
23  A  I can't speak for the examiner.
24  BY MR. FEMAL:
25  Q  I'm going to hand you Exhibit 82 Nicholson's dep. And

### Page 94

1   it appears to be an email from -- I think it's Kohtala
2   to Dave Nicholson. And is that the Notice of
3   Allowance communication from Quarles & Brady you had
4   mentioned?
5  A  Subject says, "Sausage Tray Design Patent Application
6     Notice of Allowance."
7  Q  And then you mentioned that there were some filings in
8     Europe. Why wasn't there a subsequent filing in
9     Canada?
10     MS. WILBERT: Objection. Calls for
11     information --
12  Q  Any reason?
13     MS. WILBERT: Objection. Calls for
14     information that may be subject to the
15     attorney-client privilege. I caution you not to
16     reveal any communications with your attorney
17     about legal strategy related to a particular
18     country. If Johnsonville has specific facts
19     outside of your conversations with Quarles
20     attorneys, you can respond.
21  A  I will not answer the question.
22  BY MR. FEMAL:
23  Q  Well, what about marketing? Do you sell in Canada?
24  A  Do we sell products in Canada?
25  Q  Yes.

### Page 95

1  A  Yes, we do.
2  Q  Do you sell curved trays in Canada?
3  A  Yes, we do.
4  Q  Independent of anything from Quarles & Brady, why
5     would you not want to file a patent application in
6     Canada?
7  A  I can't provide an answer for that.
8  Q  There is some curious decisions not to disclose the
9     patent application on the utility during the
10    prosecution of the 754 patent, and so I'm going to get
11    into some questions about that. Was the 717
12    application disclosed to the examiner for the design
13    application?
14 A  717 is the utility application?
15 Q  Yes.
16 A  What was the specific question again? Sorry.
17 Q  Yes. Was the 717 application disclosed to the
18    examiner for the design application?
19 A  According to what the company knows, it was not
20    disclosed to the design examiner.
21 Q  Why not?
22 A  We don't know.
23 Q  We went through previous questions showing that the
24    design -- or, the utility patent application had two
25    references to Mello and the Reskow references, which

### Page 96

1   were not part of the design application. Was there
2   any reason not to disclose?
3  A  So all I would say on that is that Johnsonville
4     understands its employees involved in the prosecution
5     of the patent turned over to Johnsonville's attorneys
6     all the information we believed to be material to
7     patentability. We believed that the employees
8     involved in the prosecution of patent have not ever
9     been -- have never attempted to deceive the patent
10    office by failing to disclose material information.
11    And we further understand that Johnsonville's
12    employees involved in the prosecution of the patent do
13    not recall, do not know specific reasons why the
14    office actions were not disclosed.
15 Q  If Johnsonville didn't make that decision or know
16    anything about the decision, who made the decision?
17    Would it have been Quarles & Brady?
18 A  Your question suggests that there was a -- an
19    intentional decision made regarding this. And again,
20    I don't have -- we don't have as a company information
21    to indicate that a specific decision was made.
22 Q  Was Johnsonville told that there is a duty to disclose
23    information to the co-pending applications when there
24    is design and utility on the same sausage tray?
25    MS. WILBERT: Could I have that read back,

### Page 105

1  submitting the fee. Look at his signature. What
2  you're looking at is the file history of the design
3  patent.
4  A  Okay.
5  Q  And what's the date underneath Luke's signature?
6  A  I see a -- his name here and signature and a date of
7  January 26th, 2011.
8  Q  Is there a difference between the date of January 7th
9  and the date that he signed that? Is there a time
10 period between the two dates?
11 A  Are January 7th and January 26th different dates?
12 Q  Yeah. And how much --
13 A  They're different dates.
14 Q  -- time is between them, how many days?
15 A  It seems like it would be 19 days.
16 Q  Right. And would someone have an opportunity to file
17 a request for a continued examination and then file an
18 IDS of the cited references in the utility case?
19 A  Don't know. I'm not a patent attorney. I don't know.
20 Q  It's filed electronically. Can you file
21 electronically in one day?
22 A  I don't know. I've never filed one. I can't answer
23 that question. There's no way I can answer your
24 question.
25 Q  And so Johnsonville has no idea that it could have

### Page 106

1  filed a request for a continued examination?
2  A  I'm not suggesting Johnsonville has no idea, but I'm
3  suggesting you're asking me a question specifically
4  about the time it takes to file. I'm not qualified
5  personally to answer that question.
6  Q  Okay. How about the fact that you now know of two new
7  references rejecting utility, which has the same
8  drawings as the design, would you think about maybe
9  allowing the examiner on the design to know about
10 those two new references cited in the utility?
11     MS. WILBERT: Objection. Vague,
12 argumentative.
13 A  Yeah, I won't answer that question. You need to
14 rephrase that.
15 BY MR. FEMAL:
16 Q  Sure, I'll rephrase it. Why wouldn't you cite the new
17 prior art to the design examiner?
18 A  I don't know why you wouldn't cite that. I don't know
19 why it wasn't cited.
20 Q  Would that be deceptive?
21 A  If there were intent to deceive, I suppose it would
22 be. Again, it's our position that nobody at
23 Johnsonville intended to deceive anybody at the U.S.
24 Patent Office. We don't have details of what exactly
25 transpired and we don't have any evidence that there

### Page 107

1  was ever a specific decision made.
2  Q  Just all in the sky, all electronic things floating
3  around. No decisions made by anybody?
4     MS. WILBERT: Objection. Argumentative and
5  vague. What is the reference to the sky? Why is
6  this funny?
7     MR. FEMAL: The cloud. It's all in the
8  cloud.
9  BY MR. FEMAL:
10 Q  In short, you had plenty of time to file a request for
11 a continued examination. Why wasn't it done?
12 A  So again, that would be your supposition that we had
13 plenty of time. I honestly don't know the answer to
14 that question. I'm not a patent attorney. Why wasn't
15 it done? We don't have knowledge of why it was not
16 done.
17 Q  Yeah.
18 A  We provided the evidence that we have and the facts
19 that we have that would pertain to this question. We
20 don't have any evidence to suggest there was any
21 specific decision not to file that or disclose that.
22 Q  Was there intent to have the design case issue without
23 the examiner knowing about the utility references?
24 A  We are not aware of any intent to do that.
25 Q  Why do you think there's no intent?

### Page 108

1  A  Johnsonville, at its core, is focused on being an
2  ethical company, and integrity is one of our core
3  values that we learn -- I learned in my first week at
4  Johnsonville. It's expected that we operate with
5  integrity and with honesty. While I don't know all
6  the details of what may or may not happen, we provided
7  all the details that we have. I know that the
8  expectation at Johnsonville would be anyone in that
9  situation would act ethically and honestly.
10     (Exhibit 230 identified)
11 Q  I would like to enter into -- as Exhibit 220, or 230
12 -- yeah.
13     THE REPORTER: Not the front, this page?
14     MR. FEMAL: No, the whole thing.
15 Q  And turning to page 5, interrogatory number 5, the
16 question is asked of Johnsonville: "State all reasons
17 utility app 717 was not disclosed to the examiner of
18 the patent in suit during the prosecution of the
19 patent in suit, and for each stated reason provide a
20 detailed explanation of the facts supporting such
21 reason." And would you read Johnsonville's answer?
22 A  Could you clarify for me really quickly which topic
23 we're on?
24 Q  You're on the topic on decision not to disclose office
25 action rejecting U.S. patent application.

## Page 109

1  A  Okay. Okay.
2  Q  And these are your sworn, signed interrogatory
3     answers?
4  A  Yes. So what did you ask me to read again?
5  Q  The question that we asked Johnsonville Corporation
6     is, state all reasons why you didn't cite the utility
7     patent application to the examiner of the patent in
8     suit, which is the design patent, during the
9     prosecution of the patent in suit because you hadn't
10    paid the issue fee yet, so it's still pending, and for
11    each stated reason provide a detailed explanation of
12    the facts supporting each reason. And what answer did
13    Johnsonville have?
14 A  Under interrogatory number 5?
15 Q  Yes. What was your answer?
16 A  I will read the answer. In its entirety?
17 Q  Yeah, you can read it in entirety.
18 A  Okay. "Johnsonville objects to this interrogatory as
19    overly broad, unduly burdensome, and not reasonably
20    calculated to lead to the discovery of admissible
21    evidence, particularly through the use of the term
22    'all reasons.' Johnsonville further objects to this
23    interrogatory to the extent it calls for information
24    that is subject to the attorney-client privilege
25    and/or work product production. Johnsonville objects

## Page 110

1     to Klement's definition of "plaintiff" and
2     "Johnsonville" as vague, ambiguous, overly broad, and
3     unduly burdensome with respect to the inclusion of any
4     attorney, accountant, assign, agent, representative,
5     or person acting on its behalf. Klement has
6     separately issued subpoenas to the attorneys that
7     prosecuted the 754 patent and is treating those
8     attorneys as separate from Johnsonville. Johnsonville
9     shall respond to this interrogatory only on behalf of
10    itself and thus shall interpret the terms "plaintiff"
11    and "Johnsonville" to mean Johnsonville Sausage, LLC.
12    Johnsonville also objects to this interrogatory to the
13    extent it seeks information that is not within
14    Johnsonville's possession, custody, or control.
15    Subject to and without waiver of the foregoing
16    objections, and reserving the right to assert
17    additional objections, Johnsonville responds as
18    follows: The specific reasons the utility app 717 was
19    not disclosed to the examiner of the patent in suit
20    during the prosecution of the patent in suit are not
21    within Johnsonville's possession, custody, or control.
22    However, as explained in the declaration of Timothy
23    Newholm, utility app 717 is not material to
24    patentability because it does not give rise to a prima
25    facie case of unpatentability of the claim of the

## Page 111

1     application for the 754 patent. As further explained
2     in the declaration of Timothy Newholm, given the
3     differences in the interpretation of the subject
4     matter of design and utility patent applications, the
5     manner in which the scope of protection defined by
6     utility and design patent applications is defined and
7     the scope of the claims of those patent applications,
8     the positions taken by an examiner in charge of
9     utility patent application may have little or no
10    relevance to a co-pending design patent application
11    for the same or similar article, and thus would not be
12    material to the design patent application as that term
13    is designed either by Rule 56 or by Therasense. See
14    DKT16-57."
15 Q  Is this a truthful answer?
16 A  Yes, it is,
17 Q  Do you stand by this answer?
18 A  Yes.
19 Q  On page 6, first paragraph in the middle, line 4,
20    starting actually with line 3, you say there was not a
21    disclosure to the examiner of the patent in suit
22    during the prosecution of the patent in suit. You say
23    they --
24        MS. WILBERT: I think I'm lost.
25    BY MR. FEMAL:

## Page 112

1  Q  -- the specific reasons --
2        MS. WILBERT: Where are you reading from?
3     BY MR. FEMAL:
4  Q  -- you say --
5        MR. FEMAL: Page 6 in the middle, starting
6     with subject 2, paragraph.
7        MS. WILBERT: Thank you.
8     BY MR. FEMAL:
9  Q  You state that the reasons why it wasn't disclosed to
10    the examiner are not within Johnsonville's possession,
11    custody, or control. Does that mean that you never
12    knew what those reasons were?
13 A  It means we thoroughly investigated the reasons around
14    that. We provided all relevant information, and we do
15    not have an answer as to why the utility app was not
16    disclosed.
17 Q  If it's not in your possession, custody, or control,
18    is it in the possession, custody, and control of
19    Quarles & Brady?
20       MS. WILBERT: Objection. Foundation.
21 A  I won't answer that.
22    BY MR. FEMAL:
23 Q  You have to answer the question.
24 A  Would you like to rephrase it is, and why it's not --
25 Q  I said, if you're not in the possession -- says

Page 113

1   Johnsonville -- is not within Johnsonville's
2   possession, custody, or control. Well, it's in
3   somebody's possession, custody, or control. Is it in
4   possession, custody, and control of your attorneys
5   Quarles & Brady?
6  A  Again, we have turned over all relevant information
7   related to that question, and there is no additional
8   information available that does not waive privilege.
9   There is nothing else to provide on that topic.
10 Q  In short is what you're saying is that you never had
11   possession, custody, or control of that answer?
12      MS. WILBERT: Objection. Misstates previous
13   testimony.
14 BY MR. FEMAL:
15 Q  Is that true, it's not in Johnsonville's possession,
16   custody, or control?
17 A  Johnsonville understands that its employees involved
18   in the prosecution of this patent, and in terms of
19   disclosing of the utility patent, acted in good faith
20   and did not attempt to deceive the patent office. We
21   further understands that -- we further understand that
22   employees involved in the prosecution of the patent do
23   not recall or do not know the specific reason why the
24   prior art or the utility application were not
25   disclosed during the prosecution of the design

Page 114

1   application.
2  Q  And then in the next sentence, you state the
3   declaration of Timothy Newholm, which was provided in
4   this lawsuit, that the utility app 717 is not material
5   to the patentability because it does not give rise to
6   prima facie case of unpatentability of the claim of
7   the application for the 754 patent. And then it gives
8   docket 16, paragraph 60 to 62. Do you fully adopt and
9   believe that declaration of Timothy Newholm was
10   correct in all phases?
11 A  Yes, we do.
12 Q  So you stand by the...
13 A  Define -- I guess, define "in all phases." But as it
14   pertains to this statement, yes, we trust his
15   expertise.
16 Q  Which Johnsonville employees did you ask about why
17   this wasn't disclosed?
18 A  So we talked to Jim Mueller, we talked to David
19   Nicholson, we talked to Steve Laack, pertaining to the
20   time period in question. That was five months ago
21   when we first scheduled this deposition, so I'm trying
22   to recall. Certain of those three individuals.
23 Q  And none of those individuals knew anything about why
24   it was not disclosed?
25      MS. WILBERT: Objection. Vague as to

Page 115

1   "anything."
2      I guess I'll also caution, to the extent
3   they have -- that you have information that was
4   communicated through Quarles & Brady as a result
5   of conversation with attorneys --
6      THE WITNESS: Yeah.
7      MS. WILBERT: -- do not reveal the
8   attorney-client communication.
9      THE WITNESS: Of course.
10      MS. WILBERT: To the extent they told you
11   something that you feel is responsive independent
12   of advice of counsel, you can provide those
13   facts.
14 BY MR. FEMAL:
15 Q  What kind of information was disclosed amongst the
16   Johnsonville employees?
17 A  In my conversations with the employees, I asked David
18   Nicholson briefly about a prototype tray that was
19   asked for. My conversation with Steve Laack was -- I
20   don't recall the conversation with Steve Laack, other
21   than that we talked for a couple of minutes. I
22   believe it was tied to purchase orders. My
23   conversation with Jim Mueller was more focused on --
24   and I had more extensive conversation with Jim Mueller
25   -- more focused on consumer research, the entire

Page 116

1   chronology of how we developed this design patent, and
2   the marketing desire to find a curved and unique tray.
3  Q  Were there any --
4  A  Those were my conversations with those gentlemen.
5  Q  Were there any affidavits, notes, or statements from
6   them in writing or other things related to?
7  A  Can you -- I'm sorry, can you please --
8  Q  Yeah, were there any, you know, affidavits, like this
9   declaration that Newholm provided? Did Jim Mueller,
10   or Nicholson, or Laack provide any affidavits around
11   the subject matter of why decided not to disclose the
12   717 utility application --
13 A  In my conversations with --
14 Q  -- prior -- yeah.
15 A  -- them representing the company, I never saw anything
16   like that, no.
17 Q  There's no notes or statements from them?
18 A  In my conversations with them representing the
19   company, I did not see any of those statements,
20   affidavits, or anything that you speak of. We had
21   several informal conversations.
22 Q  Now, an important third party, Mr. Benson, that was
23   involved in turning over his inventions to the
24   Johnsonville company, did you ask Mr. Benson about any
25   nondisclosures, and why not?

Page 125

1     application. I don't see any reference to...
2 Q Did Luke send --
3 A ...Dean -- to Dean Benson being included in those
4     communications.
5 Q Did Luke send the final rejection to David Nicholson
6     via email?
7 A It merely says, "On May 12th, 2011, the extent of our
8     understanding is that Johnsonville received from
9     Quarles & Brady the final office action entered by the
10    examiner in the utility application." That's the
11    extent of the information I have...
12 Q Okay.
13 A ...regarding that.
14 Q There's no reference to Benson?
15 A There is not. That's the information we have.
16 Q Is it safe for me to assume that you stand by all of
17    the answers to the interrogatories that you have
18    before you?
19 A I would assume, yes.
20 Q Any that you reject at this point?
21 A Representing Johnsonville, I accept these answers as
22    valid.
23 Q In interrogatory number 7, where it says, "State all
24    reasons the office actions issued in the utility
25    application 717 received and were not disclosed to the

Page 126

1     examiner of the patent in suit during the prosecution
2     of the patent in suit. For each stated reason,
3     provide a detailed explanation of the facts supporting
4     each reason." And then you drop down to the middle of
5     that page, and it's "subject to, without waiver,
6     foregoing objections, and reserving our rights, we
7     state as follows." And you basically are repeating
8     that you rely on Timothy Newholm's response to the
9     office actions that their 717 are not material to
10    patentability. See that?
11 A Which paragraph? Sorry.
12 Q Page 8, second full paragraph.
13 A Oh, yeah. Yes, I see that.
14 Q Yeah. Do you hold true that they don't give rise to
15    patentability due to a prima facie case of
16    unpatentability of the claim or the applications for
17    the 754?
18 A I --
19       MS. WILBERT: Objection. Vague.
20 A Yeah, I don't understand your question. Can you
21    please restate that?
22    BY MR. FEMAL:
23 Q It states there that the 717 are not material to
24    patentability because they do not give rise to a prima
25    facie case of unpatentability of the claim of the

Page 127

1     application for the 754. In other words, it's stating
2     that the 717 prior art is not material to the
3     prosecution of the design patent application. That's
4     what it's stating. Is that a true statement?
5 A I'm having to take your word that that's what it's
6     stating. Again, I'm not -- I'm not a lawyer, and so
7     I'm not familiar with "prima facie" or what that
8     means. I don't feel qualified to give you an answer
9     because it's requiring interpretation.
10 Q But in short, you rely on Timothy Newholm to state
11    that the patentability of the 717 is not material to
12    the 754?
13 A I can read that sentence if you'd like me to read that
14    sentence. I'm not going to interpret it. I think the
15    sentence you're focusing on is, "However, as explained
16    in the declaration of Timothy Newholm, the office
17    actions in utility app 717 are not material to
18    patentability because they do not give rise to a prima
19    facie case of unpatentability of the claim of the
20    application for the 754 patent."
21 Q Is there any reason why information that you say is
22    not in your control and possession is not in your
23    control and possession to answer those questions?
24 A Again, it's been our stated opinion that we provided
25    all the information that we can in this case. There

Page 128

1     are situations where -- and I'll read specifically
2     what I read before -- "understands that its employees
3     involved in the prosecution of the patent do not
4     recall or do not know the specific reason why." So we
5     have provided the information that we have available.
6 Q But you're standing by the fact that you do believe
7     that Timothy Newholm's, that affidavit or declaration
8     is correct?
9 A So I take that at face value based on this document.
10    I personally do not know who Timothy Newholm is.
11 Q Do you know which employees did not recall the reasons
12    for nondisclosure of the 717 utility application
13    rejection?
14 A So I know the employees that were spoken to in regard
15    to this proceeding were, again, Steve Laack, David
16    Nicholson, Jim Mueller. We know that there were other
17    -- other members of Johnsonville that were kept in the
18    loop, so to speak, but in terms of the primary
19    contact, David Nicholson was the person at
20    Johnsonville primarily responsible for prosecution of
21    the utility application. David Nicholson kept Kevin
22    Ladwig, Michael Suprick, Jim Mueller, Steve Laack, and
23    Kara Lichtenberg generally informed of the
24    prosecution, but those individuals had little to no
25    involvement in the prosecution.

### Page 133

1. being made. Again, my note here, "Neither
2. Johnsonville nor its patent counsel disclosed the
3. Reskow reference during the prosecution of the utility
4. application. Examiner Byron P. Gehman identified the
5. Reskow reference as alleged prior art to the utility
6. application during the examination of the utility
7. application." So we had -- that's the extent of the
8. information I would have on that.
9. Q  Okay. And so you would have no -- just to go through
10. them here, you'd have no idea why this wasn't cited?
11. A  Why it wasn't disclosed?
12. Q  Yeah.
13. A  We don't know why.
14. Q  And it definitely was not disclosed to the examiner by
15. Johnsonville or Quarles?
16. A  I'm sorry, one more time?
17. Q  I said the Reskow reference was not disclosed by
18. Johnsonville or by your attorneys Quarles to the
19. examiner?
20. A  To the design --
21. Q  Design examiner, right.
22. A  -- patent design. That is correct.
23. Q  And again, who made that decision, you're not sure?
24. A  Again, you characterize it as a decision. I'll
25. continue to state that we don't have any evidence that

### Page 134

1. there was an intentional decision made to disclose,
2. not to disclose, or anything of the sort. We don't
3. believe there was any bad faith in what went forward,
4. and we don't know exactly what happened because the
5. people that were there at the time do not recall or
6. remember what specifically occurred.
7. Q  Again, in the interrogatories in regards to Reskow and
8. other references on patentability, you did not -- did
9. not discuss that amongst yourselves or view that as
10. something that would prevent patentability of the
11. design case?
12.    MS. WILBERT: Objection. Vague.
13. BY MR. FEMAL:
14. Q  In other words, when you came upon the Reskow
15. reference, did you feel that that might prevent the
16. issuance of the design patent application?
17. A  Are you referencing something in the interrogatory?
18. I'm not certain what -- what your context is.
19. Q  Yeah. The -- referencing interrogatory 7 and 8, where
20. you're discussing not referencing the prior art that's
21. cited in the 717 patent, which would include Reskow
22. and would include Mello, are there any basis for not
23. disclosing those references, other than an omission,
24. because you don't seem to have any possession,
25. custody, or control of any information, or just, you

### Page 135

1. know, omission by your counsel?
2.    MS. WILBERT: Objection. Compound.
3. BY MR. FEMAL:
4. Q  So is this whole thing, can we sum it up to just an
5. omission?
6. A  We don't know what happened. We don't -- again, we
7. don't have -- in providing all the information we do
8. have, there is nothing in anything we discovered that
9. would indicate a decision, an omission, or anything of
10. the sort that you're characterizing. We simply don't
11. know what happened.
12. Q  Well, certain actions were taken in both the
13. prosecution of the design patent that you went ahead
14. and paid the issue fee, and a decision was later to --
15. although, I think Luke said he was going to respond to
16. the examiner, after their summary in the utility there
17. was no response, just an abandonment. Are we to take
18. these omissions as somehow deceptive?
19. A  No. Again, we would not, as a company, characterize
20. any of these actions as intent to deceive the U.S.
21. Patent Office. We don't know exactly what happened.
22. Q  When did Johnsonville first become aware of the Reskow
23. reference?
24. A  Let me get the exact date. One moment. Just a second
25. here. Let me make sure I'm giving the right time

### Page 136

1. frame. The Reskow reference -- making sure I have the
2. right document in front of me. All right. So the
3. Reskow reference came to light for Johnsonville in
4. January 2011 when the -- as part of the office action
5. from the examiner who then cited Reskow.
6. Q  So when David Nicholson got a copy of the office
7. action, did David Nicholson tell Luke that he should
8. disclose the Reskow reference to the design examiner?
9.    MS. WILBERT: Objection. Calls for
10. information subject to the attorney-client
11. privilege.
12.    I instruct you not to answer or otherwise
13. disclose communications between prosecution
14. counsel and Johnsonville employees.
15. A  I will not answer the question.
16. BY MR. FEMAL:
17. Q  Okay. Any reason why this Reskow reference was not
18. disclosed to the examiner on the design patent?
19.    MS. WILBERT: Objection. Calls for
20. information subject to the attorney-client
21. privilege.
22.    You may respond, but please do not reveal
23. the substance of communications between
24. Johnsonville employees and prosecution counsel.
25. A  Yeah. I have no further information other than what

## Page 145

1     conversations with Johnsonville employees specifically
2     pertaining to this topic.
3 Q  Move on to the next topic, decision to not disclose
4     U.S. Patent Application 29353610 to the examiner
5     assigned to the utility app 717. Let's back up. Who
6     talked to the employees about the Mello patent?
7 A  Who talked to the --
8 Q  Who talked to the employees about the Mello patent?
9 A  As Johnsonville, I didn't talk to any other employees
10    about the Mello patent.
11 Q  I thought previously you said there was some
12    discussions amongst Mueller, Laack, and yourself.
13 A  Not pertaining to this specific topic.
14 Q  Okay. Were there the same or any employees asked
15    about why Mello was not disclosed?
16 A  No, not by Johnsonville.
17 Q  And again, a decision not to disclose U.S. Patent
18    Application 29353610 to the examiner assigned to the
19    utility application 717, why was that not disclosed?
20 A  Johnsonville understands that its employees involved
21    in the prosecution of the patent turned over to
22    Johnsonville's attorneys all information they believed
23    to be material to patentability. Johnsonville
24    understands that its employees involved in the
25    prosecution of the patent have never attempted to

## Page 146

1    deceive the patent office by failing to disclose
2    material information. Johnsonville understand that
3    its employees involved in the prosecution of the
4    patent do not recall or do not know the specific
5    reason why the design application was not disclosed
6    during the prosecution of the utility application.
7    Johnsonville understands that its employees involved
8    in the prosecution of the patent do not recall making
9    a decision about whether or not they should disclose
10   the design application to the examiner assigned to the
11   utility application.
12 Q  Again, who made that decision?
13 A  Johnsonville understands its employees involved in the
14   prosecution of the patent do not recall making a
15   decision about whether or not they should disclose the
16   design application to the examiner.
17 Q  Who made the decision to respond to office actions?
18 A  Johnsonville --
19     MS. WILBERT: Objection to the extent this
20   calls for information subject to the
21   attorney-client privilege.
22     You can respond, but do not reveal the
23   substance of communications with attorneys in
24   your response.
25 A  Johnsonville understand its employees involved in the

## Page 147

1    prosecution of the patent do not recall making a
2    decision about that.
3    BY MR. FEMAL:
4 Q  Was Johnsonville involved in the decision to respond
5    to the office actions?
6 A  Decision to respond to office actions?
7 Q  Uh-huh.
8     MS. WILBERT: Objection. Vague.
9 A  Can you be more specific?
10   BY MR. FEMAL:
11 Q  Yes. Was Johnsonville --
12 A  There's -- we're talking about several applications
13   and --
14 Q  Was Johnsonville involved in responding to the office
15   actions in either the design patent or the utility
16   patent?
17     MS. WILBERT: Objection. Compound.
18 A  Would you like to be more specific?
19   BY MR. FEMAL:
20 Q  Was Johnsonville involved in the design patent
21   application response?
22 A  Can you specify the -- again, the design application
23   response?
24 Q  Yes. The design application that resulted in this 754
25   patent.

## Page 148

1 A  Okay. The information I have says that Johnsonville
2    received the notice of allowance of its design
3    application from Quarles & Brady on November 2nd,
4    2010. On March 8th, 2011, Johnsonville received from
5    Quarles & Brady the issue notification of the design
6    patent. That's the extent of the knowledge the
7    company has about that interaction.
8 Q  And the utility patent?
9 A  For the utility patent -- and again, you're asking
10   about -- remind me of the question.
11 Q  Yes.
12 A  All responses to --
13 Q  All responses to the office actions --
14 A  Okay.
15 Q  -- in the utility patent.
16 A  Okay. Let me read through what information we have
17   available. And again, it's referring to the U.S.
18   Patent Office, correct?
19 Q  Yes.
20 A  Okay. It says here that December 20th, 2010,
21   Johnsonville received from Quarles & Brady the
22   restriction requirement entered by the examiner of the
23   utility application.
24     December 23rd, 2010, Johnsonville received a copy
25   of the filed response to the restriction requirement.